UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LISA KOSS, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 12-30170-MGM |
| PALMER FIRE DISTRICT NUMBER ONE | * |
| AND PALMER WATER DISTRICT | * |
| NUMBER ONE, WILLIAM COLE and | * |
| CHARLES M. CALLAHAN, III | * |
| | * |
| Defendants. | * |
| | * |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 59)

October 15, 2014

MASTROIANNI, U.S.D.J.

## I.  INTRODUCTION

Lisa Koss ("Plaintiff") filed an eight-count complaint alleging that Defendants, Palmer Fire District Number One And Palmer Water District Number One ("Palmer Fire And Water"), William Cole ("Cole"), and Charles M. Callahan, III ("Callahan"), sexually harassed and retaliated against her, in violation of federal and Massachusetts law, while she was employed at Palmer Fire And Water. Defendants deny all material allegations and have moved for summary judgment on all counts.

For the reasons set forth below, the court will deny Defendants' motion for summary judgment in its entirety.

## II.  FACTS

**A. Background**

Palmer Fire District acquired Palmer Water District in 1920, resulting in a single entity that has been officially known as Palmer Fire District Number One and Palmer Water District Number One since at least 1988. See 1988 Mass. Acts ch. 142.¹ Defendant William Cole ("Cole") is currently the elected treasurer of this entity. (Dkt. No. 69-2, Koss Aff. ¶18.) Defendant Charles M. Callahan ("Callahan") is the elected Chairman of the Board of Water Commissioners. (Dkt. No. 69-2, Koss Aff. ¶18; Dkt. No. 62-1, Callahan Aff. ¶7.) Plaintiff began working at Palmer Fire And Water in 1993 as a clerk, handling the administrative duties of the water department. (Dkt. No. 62-3, Koss Dep. 17.) Cole supervised Plaintiff from 1993 until he retired in 2011, at which point he continued to perform payroll for Palmer Fire And Water. (Id. at 17; Dkt. No. 62-2, Cole Dep. 10; Dkt. No. 62-15, Cole Aff. ¶6.)

Following Cole's retirement, James Ammann ("Ammann"), the Superintendent of Palmer Fire And Water, supervised Plaintiff. (Dkt. No. 62-3, Koss Dep. 18.) Joseph Mastalerz ("Mastalerz") served as secretary of the the Board of Water Commissioners during Plaintiff's tenure at Palmer Fire And Water. (Dkt. No. 69-2, Koss Aff. ¶18.)

### B. Facts Supporting Plaintiff's Allegations

(1) <u>Non-Physical Conduct by Cole</u>

From 2008 through the end of Plaintiff's tenure at Palmer Fire And Water,² Cole frequently leered and stared at Plaintiff in a sexual manner while she cleaned the office or unpacked supplies. (Dkt. No. 62-3, Koss Dep. 54, 73.) This behavior was typically accompanied by comments, including Cole's telling Plaintiff that her husband is a lucky man, and/or that Cole "wish[ed] he had someone like Plaintiff." (Id. at 24-25.) Plaintiff recalled one very specific remark of this sort, made in

---
¹ A copy of this Session Law is attached as Ex. G to Plaintiff's Responses to Defendants' Statement of Material Facts ("PSOF"), Dkt. No. 69.
² Plaintiff's complaint does not include allegations arising out of conduct that occurred prior to 2008.

2

2011, when Cole said to her, "I wish I had somebody like you at home…baby I could make your head spin." (Dkt. No. 69-2, Koss Aff. ¶22.)

In 2009 and early 2010, Cole also frequently commented about Plaintiff's clothing, specifically pertaining to the way that it fit her. (Dkt. No. 62-3, Koss Dep. 83.) These comments included (but were not limited to) a comment Cole made when Plaintiff was wearing a "long summer dress," specifically that she "should be showing [her] assets." (Id. at 84.) In the fall of 2010, Cole made a remark to Plaintiff about how she could pole dance for him in the back room of his office. (Id. at 29-30.) On an occasion in 2011 when Plaintiff was eating a banana, Cole said to her, "I've never seen anybody eat a banana like you before," and Plaintiff recalls that Cole "had a smirk on his face when he said it." (Id. at 58-59.) Plaintiff also reports that in 2011, Cole used the bathroom in front of Plaintiff with the door open while laughing. (Id. at 70-72.) At one point in 2012, Plaintiff was making copies when Cole opened his mouth, stuck his tongue out, and wiggled it in what Plaintiff perceived to be a sexual manner. (Id. at 81.)

Plaintiff also reports many other instances of periodic behavior constituting sexual harassment, which she does not explicitly parse out by date. For example, Plaintiff alleges that Cole frequently attempted to draw her attention to lingerie-clad women depicted in newspapers and magazines, inquiring as to whether Plaintiff "looked like [the women in the pictures]." (Id. at 43.) Another recurring example of Cole's behavior arose when, following a remark or indication by Plaintiff that she was tired, Cole would tell her that Plaintiff's husband is a lucky man and would then surmise that Plaintiff must have been "rocking on Cedar Hill Street last night." (Id. at 64.)

(2) <u>Physical Conduct by Cole</u>

In June of 2008, Cole asked Plaintiff if she was wearing a bra. (Id. at 21-22.) After she answered that she was, he said "let me see" and reached for the middle of Plaintiff's shirt. (Id.) He

3

then tried to pull it open and look down. (Id.) Plaintiff explained that she did not report the incident at this time for fear of losing her job. (Id.) Later, in August of 2011, Cole came up behind Plaintiff and stood in such proximity that he was "almost touching her from behind." (Id. at 31-34, 41) On February 6, 2012, Cole again came up behind Plaintiff and brushed his chest against her back shoulder and breathed on her neck. (Id. at 74)

(3) Plaintiff's Internal Complaints and Facts Supporting Claim of Retaliation

On September 23, 2011, Plaintiff called Mastalerz and complained about the August 2011 incident during which Cole stood so close to Plaintiff that his body almost touched hers. (Dkt. No. 69-2, Koss Aff. ¶19.) One week later, Mastalerz told Plaintiff that she did not have to worry about working with Cole because he was retiring and would not be in the office that much anymore. (Id. at ¶20.) In December of 2011, at the beginning of Plaintiff's approximately two-month medical leave,[3] Plaintiff requested to meet with the Board of Water Commissioners about her ongoing issues with Cole, but they did not respond to this request. (Id. at ¶21.) When she called again to make the same request, Callahan responded with a letter listing available meeting times. (Id.)

Callahan and Masterlez met with Plaintiff on January 26, 2012. (Id. at ¶22.) At this meeting, Plaintiff described a series of instances in which Cole had made her uncomfortable with his words and/or actions. (Id.) At the end of the meeting, Callahan told Plaintiff that he would "take everything under advisement" and get back to her. (Id.)

In February of 2012, after Plaintiff returned from her medical leave, Superintendent Ammann and the Board of Water Commissioners instructed Plaintiff to prepare detailed "step-by-step" instructions of every aspect of her job. (Id. at ¶23.) She then sat with Ammann for hours and went over her job duties and process with him. (Id.) Plaintiff felt that this constituted retaliatory

---

[3] Plaintiff stated that this medical leave was because of the stress caused by Cole's conduct. (Dkt. No. 69-2, Koss Aff. ¶21). Plaintiff does not indicate that she informed any of the Defendants about this specific reason for her medical leave.

4

harassment because she "had been doing the same job for many years with no issue." (Id.) In February of 2012, Plaintiff noticed that a "position for a per-diem on-call clerk was advertised for the Palmer Water Department."[4] (Id. at ¶25.)

Plaintiff next wrote two letters to Superintendent Ammann, on February 8 and 9, 2012, about Cole's continued inappropriate conduct. (Id. at ¶26-27.) Plaintiff also spoke with Ammann about the situation on February 9, 2012, and Ammann told her that he had spoken with Cole. (Id. at ¶27.) On February 10, 2012, Plaintiff received a letter from Attorney Rigali, notifying her that he would be conducting an independent investigation into her sexual harassment allegations. (Id. at ¶28.) She met with Attorney Rigali on May 10, 2012. (Id.)

On April 18, 2012, the Board of Water Commissioners asked Plaintiff to look at a supply catalog in order to assist with their search for a less-expensive letter folding machine to replace the one they had been renting. (Id. at ¶29; Dkt. No. 62-3, Koss Dep. 96-98, 123.) According to Plaintiff, "[t]hey told [her] that they were considering taking away the equipment that [she] needed to do the water bills efficiently." (Dkt. No. 69-2, Koss Aff. ¶29.) Plaintiff told the board that she did not think that she could fold 1400 bills without the proper equipment, and that she did not appreciate their attempts to use "scare tactics" on her in retaliation for her complaints. (Id.)

On May 11, 2012, Callahan and Mastalerz came into Plaintiff's office to tell her that, at the Annual District Meeting, they decided to cut her hours from 40 to 16 and take away all of her benefits, without a reduction in work-product expectation. (Id. at ¶30.) They also forced her to use her saved vacation time before the end of the fiscal year. (Id.) Lastly, at this encounter, Callahan told Plaintiff that she "should really consider looking for another job." (Id.) Plaintiff responded that she would not leave because she had too many years in the retirement system already and that she "was not giving into their scare tactics." (Id.)

---

[4] Plaintiff does not allege, however, that this position was ever filled during her tenure at Palmer Fire And Water.

5

Plaintiff then received a form from Palmer Fire And Water regarding her health insurance, which "made it appear that [she] was willingly giving up [her] health insurance in July 2012." (Id. at ¶31.) Plaintiff reports that she told her employer that she did not want to sign this form. (Id.) In July of 2012, she received a form that stated that she "left employ," though she continued to work for Palmer Fire And Water. (Id.)

On July 19, 2012, after working reduced hours for about two weeks, Plaintiff sent an email to Ammann pertaining to the "backlog of work due to the unfair cutting of [her] hours." (Id. at ¶32.) She wrote that she could not help but feel that the change in her work hours occurred in retaliation for her sexual harassment complaints. (Id.) On July 23, 2012, Plaintiff received an email from Ammann regarding the prioritization of her work. (Id. at ¶33.) Plaintiff explained to Ammann that the reduction in her hours prevented her from keeping up with the work. (Id.)

On August 9, 2012, Plaintiff was able to "run the billing." (Id. at ¶35.) Joe Masterlez and David Majka ("Majka") went to her office that day and expressed their anger that she had not run the water bills at an earlier date. (Id.) Masterlez said that Plaintiff had told him that the bills would go out on the preceding Monday, and Plaintiff responded that, following her change in hours, she no longer worked on Mondays. (Id.)

Later that day, Plaintiff sent Ammann an email detailing her encounter with Masterlez and Majka. (Id. at ¶36.) In her email, she "explained that [she] felt that the Board was trying to make [her] job a living hell so that [she] would quit because [she] brought a sexual harassment complaint before them." (Id.) She further wrote in the email that she "was not quitting and if they could show [her] how to do [her] job in 16 hours a week to please come do so and that [she] would welcome it." (Id.)

Six days later, on August 15, 2012, Plaintiff was terminated. (Id. at ¶35; Dkt. No. 62-13, Koss's Notice of Termination.) She denies any deficiencies in her performance that would have

6

warranted her termination. (Id. at ¶36.) Plaintiff also mentioned a few other instances of suspicious communication directed at her during this general time period.[5] (Dkt. No. 62-3, Koss Dep. 84-89) She admits, however, that she has no evidence to support the assumption that this conduct was related. (Dkt. No. 62-3, Koss Dep. 86-88.)

### C. Facts to Support Defendants' Alternative Explanation for Adverse Employment Action

After Cole retired in July of 2011, the Board decided to eliminate the full-time position of Office Manager instead of giving it to Plaintiff. (Dkt. No. 62-1, Callahan Aff. ¶6; Dkt. No. 62-5, Masterlez Dep. 51.) In February of 2012, Callahan received a letter from Palmer Fire And Water's water division accountant, Stephen L. Marhelewicz, informing him that the water division either needed to reduce its budget or increase its revenue. (Dkt. No. 62-1, Callahan Aff. ¶7; Dkt. No. 62-6, Letter from Marhelewicz.) As a result, Palmer Fire And Water increased the water rates charged to customers by twenty percent, effective April 1, 2012. (Dkt. No. 62-5, Masterlez Dep. 53-54; Dkt. No. 62-1, Callahan Aff. ¶8; Dkt. No. 62-7, "Notice to Customers.") The April 18, 2012 Board meeting minutes noted that the Board "talked about reducing office expenses by no longer renting the folding machine which costs approximately $500.00 a month. The discussion was to purchase a folding machine and stuff [envelopes] by hand. There [was] grave concern among the Board Members as to ongoing reductions to develop a balanced budget." (Dkt. No. 62-8, April 18th Board Meeting Minutes.)

In May of 2012, Palmer Water's budget for 2013 was passed at the Annual District Meeting. (Dkt. No. 62-5, Masterlez Dep. 53-54; Dkt. No. 62-1, Callahan Aff. ¶9.) Defendants claim that as a result of the new budget, the Board made the decision to reduce Koss's hours effective July 1, 2012.

---

[5] Plaintiff received an anonymous text from somebody that said, "I hate you" (Dkt. No. 62-3, Koss Dep. 84-86); she received a "heavy breather call" (Dkt. No. 62-3, Koss Dep. 86-88); and she received another phone call where the caller said "Hello, Mrs. Christian, ha, ha, ha, ha." (Dkt. No. 62-3, Koss Dep. 88- 89).

7

(Dkt. No. 62-3, Koss Dep. 113; Dkt. No. 62-5, Masterlez Dep. 46, 50; Dkt. No. 62-1 Callahan Aff. ¶10; Dkt. No. 62-10, Letter Informing Plaintiff of Hours Reduction.) Another formerly full-time employee, Matthew Caulfield, had his hours reduced as well, to be effective beginning on July 1, 2012. (Dkt. No. 62-1, Callahan Aff. ¶10.)

Mastalerz explained in his deposition that at one point during Plaintiff's tenure, he asked her about the status of the billing and she responded by saying: "don't tell me how to do my job. If you don't like what I'm doing, you fire me. Fire me right now and I want it in writing." (Dkt. No. 62-5, Masterlez Dep. 44-46; Dkt. No. 62-13, Koss's Notice of Termination.) On another occasion, on August 9, 2012, after Mastalerz inquired about the status of the billing, Koss emailed Ammann and the Board stating that Mastalerz had "haggled (or better yet harassed) [her] about when the water bills [would] go out." (Dkt. No. 62-3, Koss Dep. 110-112; Exh. N, Email to Ammann.)

Effective August 16, 2012, the Board decided to terminate Koss's employment. (Dkt. No. 62-13, Koss's Notice of Termination.) Callahan sent Koss a letter explaining that the Board decided to terminate her employment because (1) she was hostile, argumentative, and disrespectful toward her immediate supervisor and board members; and (2) she was insubordinate and was not performing her job duties in a timely manner. (Id.)

### III. DISCUSSION

#### A. Standard

Summary judgment is appropriate only when the pleadings and other submissions show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "All factual disputes and any competing rational inferences [should] be resolved in the light most favorable to the party opposing summary judgment." Ford v. Suffolk County, 154 F. Supp. 2d 131, 139 (D. Mass.2001) (quotations and citations omitted). The

8

role of the trial judge at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

**B. Palmer Fire And Water's Status as an Employer under the Applicable Statutes**

Plaintiff's eight-count amended complaint includes one count of Sexual Harassment against Palmer Fire And Water under 42 U.S.C. 2003(b) ("Title VII"), one count of Retaliation against Palmer Fire And Water under Title VII, one count of Sexual Harassment against Palmer Fire And Water under MASS. GEN. LAWS ch. 151B ("ch. 151B"), and one count of Retaliation against Palmer Fire And Water under ch. 151B. (Dkt. No. 85.) Title VII defines an employer as having at least fifteen employees, 42 U.S.C. 2003(b); and ch. 151B defines an employer as having at least six employees. MASS. GEN. LAWS ch. 151B. Palmer Fire And Water argues that it is entitled to summary judgment on all of these counts because it does not employ the requisite number of people to be considered an employer under either statute. (Dkt. No. 64, Memorandum in Support of Defendants' Motion for Summary Judgment 4-6). The court disagrees.

Palmer Fire And Water's contention relies upon the premise that the true name of their entity is "Palmer Water,"[6] and therefore that only the employees that work for the water division should be considered for this purpose. Plaintiff has submitted sufficient evidence that renders the question of whether "Palmer Fire District Number One and Palmer Water District Number One" is the true name of the entity to be a genuine issue of material fact. See Hodgens, 144 F.3d at 167 (role of court is to determine whether there is a genuine issue for trial). Plaintiff points, for example, to

---

[6] In Plaintiff's original complaint (Dkt. No. 1), Plaintiff named "Palmer Water Department" as a defendant, but Plaintiff amended this complaint on September 24, 2014 pursuant to this Court's order (Dkt. No. 82), to instead name "Palmer Fire District Number One And Palmer Water District Number One" as a defendant (Dkt No. 85). (Compare October 4, 2012 Complaint (Dkt. No. 1) with September 24, 2014 Amended Complaint (Dkt. No. 85).)

9

evidence that the Massachusetts Legislature considers Palmer Fire And Water to be one entity.[7] See 1988 Mass. Acts ch. 142 ("An Act Further Regulating Palmer Fire District Number One of Palmer," striking out the words "of Palmer" from the title of the entity, "and inserting in place thereof the words: and Palmer Water District Number One").

Additionally, in her affidavit, Plaintiff named the forty-six employees she believes to have been employed by the Defendant entity. (Dkt. No. 69-2, Koss Aff. ¶18 ("I assisted the office manager in preparing budgets which included all 46 employees of Palmer Fire District Number One and Palmer Water District Number One, and these paid employees were as follows: [names all employees].").) As a result, the court considers the question of whether Palmer Fire And Water constitutes an employer under the statute to be a genuine issue of material fact as well. Even if this court considers Defendant's submitted evidence that disputes Plaintiff's statements to be conflicting for these purposes, "[a]ll factual disputes and any competing rational inferences [must] be resolved in the light most favorable to the party opposing summary judgment." See Ford v. Suffolk County, 154 F. Supp. 2d 131, 139 (D. Mass.2001) (citation omitted).

### C. Plaintiff's Claims of Sexual Harassment

Plaintiff claims that Defendants are responsible for conduct constituting sexual harassment under Title VII and ch. 151B, and Defendants contend that they are entitled to summary judgment on these counts. This Court disagrees with Defendants.

A plaintiff may make out a claim for "hostile environment" sexual harassment under federal and Massachusetts law if the conduct complained of is hostile and abusive, unwelcome, and sufficiently pervasive or severe to alter the terms and conditions of the victim's employment and create an abusive work environment. Ruffino v. State St. Bank & Trust Co., 908 F. Supp. 1019, 1036

---

[7] Defendants have argued that, notwithstanding this statute, Palmer Fire And Water consists of more than one entity for these purposes. In the court's view, this argument lacks merit.

(D. Mass.1995) (citing Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 782 (1st Cir. 1990)); see Harris v. Forklift Sys., 510 U.S. 17, 23 (1993) (circumstances may include the frequency of the discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance). To give rise to a sexual harassment claim, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).[8]

The First Circuit has interpreted Title VII's definition of sexual harassment statute liberally in this context, as it has consistently indicated that no particular "types of behavior" are essential for a hostile environment claim to survive a motion for summary judgment. See Billings, 515 F.3d at 48 ("a worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed" (quotations, brackets, and citations omitted)); see also e.g., Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19-20 (1st Cir. 2002) ("sexual remarks and innuendos," including "a sexual invitation," as well as "unwelcome physical touching" was sufficient); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 397-98 (1st Cir. 2002); Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55-56 (1st Cir. 2000) (repeated requests for dates and use of suggestive language was sufficient). As illustration of these flexible requirements for a prima facie case, the First Circuit

---

[8] In addition to the specific alleged perpetrator of the conduct constituting harassment, Massachusetts and federal Courts agree that employing entities and employers may also be liable for sexual harassment when the entity/employer "is aware of sexual harassment in the workplace, whether caused by supervisors, coworkers, or customers, and fails to take adequate steps to remedy the situation." College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 591 (Mass.1987); see Brissette v. Franklin County Sheriff's Office, 235 F. Supp. 2d 63, 89-90 (D. Mass.2003) (Employer subjected the employees to a hostile work environment where the court found that the employer undoubtedly knew, or certainly should have known, of the unlawful conduct fostered and promoted by subordinates, peers, and superiors and where the action taken by the employer was neither prompt nor appropriate.); Chapin v. University of Massachusetts, 977 F. Supp. 72, 79-80 (D. Mass.1997) ("A failure of an employer to act in the face of knowledge that sexual harassment is occurring in the workplace may result from one of two causes. It may result from inattention, that is from negligence; but it also may result from a conscious act of the will, that is, from deliberate indifference." Additionally, Massachusetts and federal courts would agree that non-action by a supervisory employee, with knowledge that sexual harassment or other prohibited discrimination is occurring in the workplace, is actionable by a victim of the wrongdoing).

11

vacated an entry of summary judgment in Billings v. Town of Grafton when a supervisor did not make any inappropriate comments or touch the plaintiff, but merely demonstrated a pattern of staring at plaintiff's breasts. See id. at 51-52, 57. Massachusetts Courts agree that suggestive comments and sexually inappropriate actions can be objectively offensive, severe, and pervasive enough to support a finding of harassment under the applicable state statute, even without allegations of physical contact. See Salvi v. Suffolk County Sheriff's Dep't, 885 N.E.2d 777 (Mass. App. Ct.2006) ("[h]arassment is defined by [Massachusetts] statute to include 'verbal...conduct of a sexual nature'" (quoting MASS. GEN. LAWS ch. 151B)).

Here, Plaintiff's allegations, supported by comments she made at her deposition and in her affidavit, certainly rise to a level far above the conduct in Billings that survived a motion for summary judgment. See Billings, 515 F.3d at 51-52, 57. Furthermore, Plaintiff's allegations considered in the aggregate,[9] which include many instances of both physical and non-physical conduct over several years, undoubtedly suffice to meet the First Circuit's standard for summary judgment motions. See, e.g., Hernandez-Loring, 233 F.3d 49 at 55-56.

### D. Plaintiff's Claims of Retaliation

Plaintiff claims that after she complained about sexual harassment, all Defendants retaliated against her in violation of protections established under Title VII and ch. 151B. Defendants contend that they are entitled to summary judgment for all retaliation claims. This court disagrees.

"To prove a claim of retaliation, a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Calero-Cerezo v. United States

---

[9] During oral argument, Defendant implicitly contended that each specific instance of conduct alleged by Plaintiff should be parsed and analyzed accordingly. This Court rejects that approach and chooses, instead, to consider the allegations in the aggregate. *See* Noviello v. City of Boston, 398 F.3d 76, 93 (1st Cir. 2005) ("The only question is whether the bad acts, taken in the aggregate, are sufficiently severe or pervasive to constitute actionable harassment." (emphasis added)).

DOJ, 355 F.3d 6, 25-26 (1st Cir. 2004) (noting also that Plaintiff's "prima facie burden in [the] context [of retaliation] is not an onerous one"); Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005) (same elements to establish retaliation under Mass G.L. c. 151B). Defendants do not contest the fact that Plaintiff engaged in protected conduct, nor do they contest the fact that she experienced an adverse employment action. Rather, Defendants only contest that there was a causal connection between the two, contending that "Koss's hours were reduced solely because of business necessity, which has absolutely nothing to do with her report of alleged harassment." (Dkt. No. 64, Memorandum in Support of Defendants' Motion for Summary Judgment 20.)

When evaluating the issue of whether an employer's stated reason for adverse employment action is mere pretext, the First Circuit has advised courts to be "particularly cautious" about granting employers' motions for summary judgment. See Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983). Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's purported motive is legitimate, there is reason to be concerned about the possibility that an employer could disguise its impermissibly-motivated adverse employment action under a veil of permissible cause. See Hodgens, 144 F. 3d at 167. For these reasons, trial courts "should 'use restraint in granting summary judgment' where [impermissible] animus is in issue." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (quoting Valles Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir. 1984)); see also Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) (subjective evaluations of performance may be susceptible to abuse and may mask pretext). Massachusetts courts concur with their federal counterparts in this context. See Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 114 (Mass.1995) (summary judgment is a disfavored remedy in discrimination cases); accord Holland v. BLH Elecs., Inc., 792 N.E.2d 672, 675 (Mass. App. Ct.2003).

At the summary judgment stage, a high degree of temporal proximity between protected conduct and adverse employment action typically suffices for courts to infer that that there may have been a causal connection between the two. See Calero-Cerezo, 335 F.3d at 25; see also Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988) ("A showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.").[10]

Here, Plaintiff's hours were reduced by more than half exactly one day after she met with Attorney Rigali, the attorney who was purportedly independently investigating her sexual harassment complaint, on May 10, 2012. (Dkt. No. 69-2, Koss Aff. ¶28) This temporal proximity is sufficient to establish a causal connection for the purposes of summary judgment, thereby fulfilling Plaintiff's prima facie obligation. See Calero-Cerezo, 335 F.3d at 25. Even if Defendants were correct in their contention that Plaintiff's ultimate termination occurred as a result of her inappropriate behavior, Defendants fail to sufficiently explain away the extremely suggestive proximity between Plaintiff's pursuit of her complaints and their decision to cut her hours and benefits.[11] See Fennell v. First Step

---

[10] Defendants' strict application of the burden-shifting framework from McDonnell Douglas v. Green is not appropriate for this situation. See 411 U.S. 792, 801-803 (1973) (establishing framework upon which Defendants rely, and applying it to a racial discrimination issue). The First Circuit has explained that "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, 83 F.3d 526, 535 (1st Cir. 1996); accord Calero-Cerezo v. United States DOJ, 355 F.3d 6, 26 (1st Cir. 2004); see Mesnick v. General Electric Co., 950 F.2d 816, 827 (1st Cir. 1991) ("courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole"). For this reason, the court disagrees with Defendants' contention that they are entitled to summary judgment solely because Plaintiff is unable to decisively demonstrate at this stage that Defendants' purported reason for adverse employment action constitutes pretext. See generally Ford v. Suffolk County, 154 F. Supp. 2d 131, 139 (D. Mass.2001) (all competing rational inferences should be resolved in favor of the non-moving party at the summary judgment stage).

[11] Moreover, even if this Court were to accept Defendants' contention that Plaintiff's hours were only reduced pursuant to a budget-reduction suggestion from their accountant, Defendants' argument still would not succeed. Specifically, Defendants have failed to explain why they needed to both raise revenue by 20% and make staffing reductions when the evidence before the court indicates that only one of the steps was necessary. (Dkt. No. 62-1, Callahan Aff. ¶7; Dkt. No. 62-6, Letter from Marhelewicz.) Since the evidence before the court indicates that Defendants did, in fact, take measures to raise the revenue by what this court deems to be a significant margin (Dkt. No. 62-1, Callahan Aff. ¶7), it is unclear why it was additionally necessary to reduce Plaintiff's hours. See generally Ford, 154 F. Supp. 2d at 139.

14

Designs, 83 F.3d 526, 535 (1st Cir. 1996) (at summary judgment, courts focus on whether the evidence as a whole is sufficient to make out a jury question as to pretext and animus).

## IV.  CONCLUSION

For the reasons set forth above, when the evidence is viewed in the light most favorable to Plaintiff, Defendants' arguments in support of their motion for summary judgment are unavailing. Accordingly, Defendants' motion for summary judgment (Dkt. No. 59) is DENIED in its entirety.

It is So Ordered.

       /s/ Mark G. Mastroianni
    MARK G. MASTROIANNI
    United States District Judge