1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2                          WESTERN SECTION

3

4

5

    Lisa Koss                        )
6                                    )        12cv30170-MGM
    vs                               )
7                                    )
    Palmer Water Department No. 1)
8   Palmer Fire District No. 1    )
    _____)
9

10              **Transcript of conference** Held Before
              The Honorable Mark G. Mastroianni,
11             United States District Court Judge,
                     on **April 13, 2015.**
12

13

14   <u>APPEARANCES</u>:

15

    For the plaintiff:  Michael O. Shea, 3 Crane Park Drive,
16   Suite 7, Wilbraham, MA 01095.

17   Daniel J. O'Connell, 75 Market Place, Springfield, MA
    01103.
18
    For the defendant: Karina L. Schrengohst, 270 Pleasant
19   Street, Northhampton, MA 01060.

20   Robert Aronson, 270 Pleasant Street, Northampton, MA
    01060.
21

22                  Alice Moran, CSR, RPR, RMR
                  Official Federal Court Reporter
23                 300 State Street, Room 303D
                      Springfield, MA 01105
24             Tel: (413)731-0086  Fax: (413)737-7333
                    alice.moran@verizon.net
25

1    **(Court commenced at 2:07.)**

2            THE CLERK:  Be seated.  Judge, the matter before

3    the Court is Koss versus Palmer Water Department, Civil

4    Action 12-30170.

5        Can counsel please identify themselves for the

6    record?

7            MR. SHEA:  Good afternoon.  Michael Shea for the

8    plaintiff.

9            MR. O'CONNELL:  Daniel O'Connell for the

10   plaintiff.

11           MS. SCHRENGOHST:  Karina Schrengohst for the

12   defendant, Your Honor.

13           MR. ARONSON:  Robert Aronson for the

14   defendant.

15           THE COURT:  All right.  Good to see you all.  We

16   have two motions.  I don't know if there's more that I

17   don't see here.  The first motion is the plaintiff's

18   motion in limine regarding number of employees and the

19   defendants' motion in limine to exclude testimony and

20   opposition filed by both parties.  All right.

21       So on plaintiff's motion, regarding number of

22   employees I'll hear you.

23           MR. SHEA:  Yes, Your Honor.  First of all, in

24   the pretrial memo, Your Honor, there's a section that asks

25   whether there are -- essentially asks whether there are

1   any amendments requested in this case.

2        As the Court may recall, we did file a motion to

3   amend, and I think we asked for reconsideration on that

4   motion to amend to add the state law claims on the number

5   of employees in the event that the jury found that there

6   were less than the requisite number for each statute and

7   so we put none.

8        I didn't want to upset the Court by renewing it

9   again, but I just wanted to renew it verbally again if for

10  no other reason to preserve the record on appeal.

11  Frankly, I think the case law talks about even motions at

12  trial that can form motions to amend to add claims that

13  conform to the evidence are allowed as long as there's no

14  prejudice.

15       So having said that, Your Honor --

16            THE COURT:  I recall the motion.  However, I was

17  not -- without being put on notice by a written pleading,

18  I didn't read the ruling to review that issue so I'm not

19  going to accept your renewing it verbally.

20       If you have a good faith reason to file another

21  reconsideration, then file it.  If there's something that

22  merits the reconsideration in my mind, I'll give it to

23  you, but I'm not going to just let you verbally come in

24  and renew it that way.  So consider your options.  If you

25  want to file something, you can file something.  I'll deal

1    with it accordingly and that way the opposing side will be

2    on notice as well.

3                    MR. SHEA:   Okay.   That may go a long way, Your

4    Honor, if that state law claim came in the alternative, it

5    may go a long way to just ease the allowance of the jury

6    to decide --

7                    THE COURT:   Right now we are going to assume

8    that it's not.   That's where we stand.

9                    MR. SHEA:   I understand.   So we filed this

10   motion to sort of cut to the chase here on what we

11   perceived as obvious and that is that the Fire District

12   and Water Department are really one.   They're combined by

13   statute, Your Honor.   As you may recall, we pointed that

14   out in our previous motion to amend.

15                   THE COURT:   Chapter 142.

16                   MR. SHEA:   I believe so, Your Honor.

17                   THE COURT:   Yes.   All right.

18                   MR. SHEA:   And so the Court can take judicial

19   notice of the fact that they're legally statutorily one

20   entity, and with the two entities I don't think there's

21   any dispute that the number of employees on the roster is

22   46 and so that well exceeds the 15 for Title VII and six

23   for 151B, the state law claim.

24                   THE COURT:   You're saying there's no dispute

25   that the total is, what did you say 46?

1          MR. SHEA:  Right.

2          THE COURT:  But there's no dispute?

3          MR. SHEA:  I don't think there's any dispute if

4    you look at both --

5          THE COURT:  Looking at both, right.

6          MR. SHEA:  And both are combined by statute,

7    Your Honor, and there's just very compelling evidence that

8    they in fact are combined.  They're statutorily combined;

9    they're in fact combined because the correspondence in the

10   letterhead, the handbook, they're in the same building.

11   The public notices that went out combined them.

12         THE COURT:  Well, even if I were to entertain

13   your request to take judicial notice that they're combined

14   under statute, the number of employees would be

15   essentially an element of your claim, wouldn't it?

16         MR. SHEA:  But if you take judicial notice of

17   the fact that they are combined, I don't think there's any

18   dispute that we well exceed the numbers for both statutes.

19         THE COURT:  Judicial notice would be combined

20   for the sake of type and how you would refer to them, but

21   even under your scenario if I took judicial notice, I'm

22   not sure I could take judicial notice of something that

23   would relieve you of establishing one of the elements of

24   your claim.

25         MR. SHEA:  If you took judicial notice, Your

```
 1    Honor, of that statute and the fact that they're combined,
 2    then the evidence that would go in would be very simple.
 3    It would be --
 4              THE COURT:  That's true.
 5              MR. SHEA:  -- both are combined and there are 46
 6    employees.
 7              THE COURT:  Sure.
 8              MR. SHEA:  That would be easy.
 9              THE COURT:  Under your version, yes, I can see
10    that.  Okay.
11              MR. SHEA:  Right.  So it would avoid this whole
12    mini trial and all this testimony and documents on the
13    subject of number of employees when they're obviously
14    combined.  That's our simple argument.
15              THE COURT:  Okay.  On that issue I will hear
16    you.
17              MS. SCHRENGOHST:  Thank you, Your Honor.
18         There's clearly a dispute about whether or not these
19    two, Palmer Water and Palmer Fire, are combined.  They are
20    two very different functions.  They employ different
21    staff.  Unlike what was stated in the motion, they don't
22    share a budget.  There are a number of distinctions
23    between the two, and so judicial notice under these
24    circumstances is not appropriate to relieve them as you
25    said of this essential element of their claim.
```

1          THE COURT:  So if there were those issues,

2     absolutely, judicial notice wouldn't be the appropriate

3     consideration.  How do you deal with the statute?

4          MS. SCHRENGOHST:  Your Honor, I can understand

5     and appreciate the position of the plaintiff, but there

6     are a lot of other factors in determining whether or not

7     there are joint employers.

8        These two businesses function completely separate and

9     apart from one other.  The Fire Department and the Water

10    Department are on the same property but they're not the

11    same building.  They're in different locations.

12       The most important part of determining whether or not

13    someone is a joint employer is whether or not they share

14    control over employment decisions.  The Fire Department

15    shares absolutely no control over hiring decisions, firing

16    decisions, discipline related to the Water Department.

17         THE COURT:  Do you think the statute that we're

18    referring to essentially establishes and names them as

19    one?

20         MS. SCHRENGOHST:  I don't think that that's

21    enough, no.

22         THE COURT:  But do you agree that's what the

23    statute does, it establishes them as one entity?

24         MS. SCHRENGOHST:  Yes.

25         THE COURT:  All right.  So for what purpose did

1    the statute establish them as one entity?

2            MS. SCHRENGOHST:  Well the primary purpose of

3    this statute is, as we mentioned, related to the budget.

4    They can't share revenue.  As the statute states here that

5    money that comes in for the Fire Department is money that

6    comes in from taxes, and money that comes in for the Water

7    Department is money from the sale of water and that these

8    two can't share revenue.

9            THE COURT:  So your argument is the statute

10   created them as one entity for a limited purpose, which

11   leaves them open to be considered separate entities for

12   other purposes?

13           MS. SCHRENGOHST:  I think that there are a lot

14   of other factors that are important other than just the

15   name of the entity that goes into determining this when

16   you have two businesses that are functioning very separate

17   from one another.

18           THE COURT:  Absolutely.  That may be entirely

19   true, but it's not often where you have in an employment

20   case a business that someone says you operate as one but

21   there's a statute created that actually addresses that.

22   Here we have a statute created.  It puts your argument in

23   a difficult light, quite frankly.

24       Can you point me to any authority, statutory history,

25   that talks about the distinction that puts it into context

1    that they're talking about, either the statute made them

2    one entity for a limited purpose and that would leave

3    still some room for you to make the argument that for

4    other purposes you can consider them two?  Do you have

5    anything?

6          MS. SCHRENGOHST:  No, Your Honor, not off the

7    top of my head.  I do not.

8       This is a very unique situation, but I think as I

9    mentioned earlier that the primary consideration in

10   determining whether or not you have joint employers is

11   listed in our opposition, and that *Romano v. U-Haul Intern*

12   talks about the different factors that you need to

13   consider, common management, and that the primary thing to

14   consider is the day-to-day control over employment

15   decisions.

16         THE COURT:  I don't dispute that those

17   considerations are very important, but as I noted

18   generally in the employment type of context of an

19   employment-related case we don't have a statute jumping in

20   and saying, all right, we're passing the statute that says

21   you are one entity.  That's the difference here.

22      I'm happy to look at something that you say doesn't

23   have that effect, but if I'm considering judicial notice,

24   that is obviously a very primary important consideration,

25   judicial notice is a statutory declaration.  All right.

1    Thank you.

2         Did you want to say anything in response?

3              MR. SHEA:  Your Honor, just it seems quite

4    obvious that right, there's a statute that clearly

5    combines them.  It doesn't make any exceptions.

6         It sort of reminds me of the statute that allows you

7    to form a corporation.  So if a corporation is sued like

8    Home Depot that has a couple different locations in

9    different departments, that is by statute one entity, Home

10   Depot, Inc. U.S.A., whatever, and so to argue that one

11   store is different from the other, it just doesn't work.

12        I mean, you can argue that they're separate but by

13   law they're combined, and I think we're just going to go

14   off on a mini trial on accounting records and testimony in

15   that regard, Your Honor, that is unnecessary.

16             MS. SCHRENGOHST:  Your Honor, if I could just

17   also add that the court has already held that this issue

18   is a question of fact and because of this it's better left

19   for the jury to hear this evidence and come to their own

20   determination about whether or not these are joint

21   employers taking into consideration the statute and all of

22   these other factors as well.

23             THE COURT:  How did the court find that it's a

24   issue of fact?

25             MS. SCHRENGOHST:  In the order and memo on

1     summary judgment dated October 15th, "The court considers

2     the question of whether Palmer Fire and Water constitutes

3     an employer under the statute to be a genuine issue of

4     material fact."  Because determining whether or not an

5     entity is an employer, it still have to establish that

6     there are enough employees and the only thing that's been

7     put forward to establish that is a list that was generated

8     without any kind of supporting documentation by

9     Ms. Koss.

10          THE COURT:  Well, in the prior -- in my prior

11    ruling you filed a motion for summary judgment and you

12    asserted, you asserted that the Court find that the name

13    of the entity is not an issue of material fact in support

14    of your summary judgment request, correct?

15          MS. SCHRENGOHST:  Your Honor, it was not that

16    narrow.  It was about the name of the entity.  That's

17    precisely this issue that we're discussing right now.

18          THE COURT:  Well, the use of the term material

19    fact in the summary judgment motion was directly linked to

20    the standard applicable at a summary judgment hearing.

21      I think you stretch it until it breaks when you say I

22    therefore found that it's a material fact in the case in

23    general.  When I applied the summary judgment standard,

24    that's the language that you're citing, the language that

25    was specifically used in a summary judgment determination

1    about finding whether or not there was a material -- a

2    material fact or not for purposes of applying the summary

3    judgment standard.

4        I don't see how you raise that saying that the Court

5    made a finding already to support your position.  I think

6    that's almost a blanket misconstruing of what the prior

7    ruling was.

8            MR. SHEA:  Your Honor, can I add that subsequent

9    to that ruling is when we filed our motion for

10   reconsideration on the motion to amend and Your Honor made

11   a comment in that ruling saying essentially that, I'm

12   paraphrasing because I don't have it in front of me, but

13   essentially saying that it's extremely compelling that

14   there's a statute combining these two departments as one,

15   as one entity, or words to that effect, and your language

16   was pretty strong in that regard, Your Honor.  And that's

17   I think part of the reason you hesitated on the motion to

18   amend is if the evidence is so compelling, that there

19   wouldn't be a need to do so.  I'm sort of reading between

20   the lines but that's how I took your ruling on that

21   motion.

22           THE COURT:  All right.  Here's what I'm going to

23   do on the plaintiff's motion in limine regarding the name

24   or whether or not there's one or two entities, on the

25   issue of whether or not the Court will take judicial

1      notice as to whether or not they're one or two entities,

2      I'm not getting into whether or not I'm going to take

3      judicial notice of the number of employees, I'm not, but I

4      am going to take judicial notice that it is one entity

5      under the statute, the statute that I've referenced.

6           I will allow the defendant to file a reconsideration

7      within seven days if you can in good faith support it with

8      case law that we talked about that exists, is there some

9      history, is there some basis for you saying the statute

10     created it for a limited -- it created one entity for a

11     limited purpose.

12          If you can't, if in good faith you can't find one,

13     you can't find one.  But it seems to me pretty clear right

14     now in looking at that statute that I can, and I'm

15     convinced that I should, take judicial notice that it's

16     one entity under that statute.  So you have seven days to

17     file a reconsideration if you can point to some case law,

18     some history, et cetera.  Of course, you will be able to

19     respond.

20          Now as to the number of employees, I'm not going to

21     carry over and take judicial notice about the number of

22     employees because that's getting -- let's assume nothing

23     is filed to have me reconsider it and we go forward on

24     judicial notice.  Nonetheless, you do have -- it's an

25     element of your case and I'm not going to relieve you of

1    that.

2         So granted how you prove that with judicial notice,

3    you'll make some choices about how you prove it as opposed

4    to the choice you would make if there weren't judicial

5    notice, but I'm not specifically going to take judicial

6    notice of a particular number of employees.

7              MR. O'CONNELL:  Your Honor, I don't mean to

8    interrupt because this has nothing to do with the motion

9    but I'm going to be trying the case and my only procedural

10   question is my understanding is that when a court does

11   take judicial notice, a lot of times I see it in auto tort

12   cases in a right of way or this is a one-way street and

13   with judicial notice the court would advise the jury that

14   there's no need to concern yourself with this because the

15   court has taken judicial notice that it's a one-way street

16   going in an easterly direction.  Will the Court --

17             THE COURT:  I would if your -- so to use your

18   hypothetical, I plan on telling the jury that this is a

19   one-way street.  I'm not going to tell them that the

20   one-way street is 35 feet in width with a certain number

21   of lanes.

22        I will tell them that I'm taking judicial notice of

23   the fact that it's one entity and the name is... It's one

24   entity and that would be it.  I'm not going to tell them

25   how many employees there are.

```
 1              MR. O'CONNELL:  That's all I wanted.  Thank you.
 2              MR. ARONSON:  Your Honor, just to pursue this
 3    little bit further.
 4              THE COURT:  Yes.
 5              MR. ARONSON:  I understand what you're saying
 6    about the statute, but it's unclear to me as to whether or
 7    not you're going to permit the defendants to argue that
 8    Palmer Water Department and the Palmer Fire District have
 9    separate functions and have separate managements and have
10    separate employees and how they interrelate; is that
11    something we are still going to be able to offer evidence
12    on?
13              THE COURT:  And it would go -- that would go to
14    what?
15              MR. ARONSON:  The issue of interrelationship.
16              THE COURT:  Go to the number of what, number of
17    employees?
18              MR. ARONSON:  Ultimately it would because the
19    predicate for finding the number of employees of Palmer
20    Fire District being employees of Palmer Water is dependant
21    upon the extent of the interrelationship between those two
22    entities.  And even though they may have the same name,
23    it's our position they have separate functions.  It's our
24    position they have separate budgets, that neither had
25    employment decision-making authority over the other, and,
```

1    therefore, it's our conclusion and our position that the

2    interrelationship is not sufficient for purposes of Title

3    VII or Section 151B to call it the same entity.

4         It's more than the issue of what their name is.  It's

5    much more in terms of what their operation is, and that's

6    why I asked the question whether we would be foreclosed

7    from showing the separate nature of these entities.

8         THE COURT:  You would not be foreclosed if it

9    goes to the limited issue of how many people you employ,

10   but if it's going to the larger picture of the judicial

11   notice is incorrect and you're going to be asking the jury

12   to find the opposite of the judicial notice, essentially

13   your argument just told me that's what you would be doing,

14   I think I would not allow you to do that.

15        MR. ARONSON:  That is not what we would be

16   arguing.  We would not be arguing judicial notice.  We

17   concede that they are the same.  They're unified for

18   purposes of their name, but it's our position that that

19   isn't enough to make the Palmer Fire District employees

20   essentially Palmer Water District employees.

21        You have to also look at the actual functioning of

22   these two entities which do operate independently and

23   separately, and I think the jury should be able to or

24   should be entitled to and I believe it's a jury question

25   and the cases hold, and so that's why we intend to present

```
 1    evidence about the separate functions, the separate

 2    budgets.

 3         There's a separation between these two companies, and

 4    it may fly in the face of somebody concluding that they

 5    have the same one name, and so I'm not clear on your

 6    ruling.  But I think that in fairness the defendant should

 7    be able to show these are not, regardless of whether

 8    statutorily they have a unified name, they are

 9    nevertheless an operation of two separate entities and

10    therefore their employees can't be intermixed.

11         It's a question of the interrelationship between

12    them.  We wouldn't be saying that the name is not Palmer

13    Water and Fire -- Palmer Water and Palmer Fire Department

14    District No. 1.  We wouldn't challenge that based on your

15    judicial notice.

16              THE COURT:  But I have to assume the legislature

17    didn't have a statute passed to just name -- to make them

18    one entity --

19              MR. ARONSON:  Well...

20              THE COURT:  -- because the legislature had

21    nothing else to do.

22              MR. SHEA:  And, Your Honor, I think the cases

23    that cite on that subject where it's a question of fact

24    for the jury don't involve a clear statute that combines

25    these two departments.
```

1          MR. ARONSON:  It doesn't really say it.  If you

2     look carefully, I'm assume you're referring to Chapter

3     142, it just says they're changing, our reading it

4     quickly.  It doesn't say that they are a unified entity

5     number one.

6          It merely says we're changing the title from "An act

7     further regulating Palmer Fire District No. 1 of Palmer,"

8     changing the last two words "of Palmer" and saying An act

9     further regulating Palmer Fire District No. 1 and it now

10    becomes the Palmer Water District No. 1.  It doesn't say

11    they're combined.  All it says is that's what we're going

12    to refer to, and they're regulating them.  One of the

13    regulations is no monies collected --

14          THE COURT:  You just argued completely,

15    completely and opposed a concession your co-counsel made

16    regarding the question I had asked her.  I asked

17    specifically, do you agree that the statute refers to them

18    combined and makes them one entity?

19          MR. ARONSON:  Well...

20          THE COURT:  I thought the answer in good -- I

21    mean, maybe I understood.

22          MR. ARONSON:  I don't mean to dispute what my

23    co-counsel said.  All I'm saying is a more careful reading

24    of this, maybe there was --

25          THE COURT:  If you can make a more careful

1   reading of this, then I suggest it should be in a pleading

2   with something that I could refer to.  So you have seven

3   days if you're going to file for reconsideration.

4        I'll take up another issue as to how far we can go to

5   work within this ruling after I determine -- you may have

6   a valid reconsideration if you can support it.  I will

7   take up the issue about how far we can go or can't go

8   after I see if we're going to have a reconsideration of

9   the ruling.

10             MR. ARONSON:  Thank you very much, Your Honor.

11             THE COURT:  Thank you.  Understand where we are?

12             MR. ARONSON:  Yes.

13             THE COURT:  Okay.  All right.  The defendants'

14   motion in limine regarding the exclusion of testimony.

15             MS. SCHRENGOHST:  Thank you, Your Honor.  After

16   Ms. Koss reported alleged harassment to Palmer Water,

17   Attorney Henry Rigali conducted an investigation into her

18   allegations.

19        At the conclusion of that investigation he submitted

20   a letter to the board of Washington D.C. Commissioners

21   summarizing his interviews and his findings and the legal

22   issues performed and some recommendations.

23        The evidence that plaintiff is seeking to get from

24   Attorney Royal and myself is easily obtained through

25   Attorney Rigali.  Neither Attorney Royal or myself

1    interviewed any people; neither of us met with anyone;

2    neither of us was present during any of these meetings in

3    the course of Attorney Rigali's investigation.

4        Attorney Rigali testified to our involvement in the

5    investigation.  He testified that we provided generic

6    information, guidance.

7        Attorney Rigali has been practicing since 1974 I

8    believe, and the suggestion that plaintiff is making is

9    that somehow Attorney Royal and I were overbearing in this

10   investigation.  Where Henry Rigali has testified that he

11   took some guidance from us but we weren't present.  We

12   weren't involved in the investigation to the extent that

13   they're suggesting, and in fact Attorney Royal never had

14   any communication with Attorney Rigali.  She neither had

15   any communications with the defendants related to the

16   investigation.

17            THE COURT:  So Judge Neiman in his order

18   indicates the documents reflected ongoing active

19   participation in the investigation on the part of the

20   attorneys at Royal LLP, like guidance, advice, direction.

21            MS. SCHRENGOHST:  Yes, Your Honor.  This was

22   prior to Attorney Rigali's deposition when he had an

23   opportunity to review these documents with Attorney Shea

24   and Attorney O'Connell.

25            THE COURT:  Well, in looking at this Judge

1    Neiman made clear findings regarding a fervor defense and

2    once that's raised, that opens up discovery issues for the

3    plaintiff being able to get those materials.  So you're

4    not disputing that, right?  That's accepted as the state

5    of law; is that your position?

6              MS. SCHRENGOHST:  Yes, Your Honor.

7              THE COURT:  Now, I do agree with you that courts

8    generally disfavor this type of situation as being created

9    where you, I mean the attorney for the defendant, is being

10   put in a situation where there's a potential conflict or

11   there's withdrawal issues, especially if there is

12   alternative means of getting that evidence.

13        You may argue the evidence is inadmissible under the

14   rules of evidence for a variety of reasons, but to start

15   with before that's going to be considered I think I'd like

16   to examine the need.

17        What's the need, plaintiff, for counsel to be called

18   as a witness as opposed to what you have available for

19   documents?  Obviously Attorney Rigali is available, right?

20             MR. SHEA:  Because it's very compelling in this

21   case, Your Honor.  In this case there is ample evidence

22   through those documents, e-mails, pre-drafts of the

23   conclusions of the investigation that the lawyers at the

24   Royal LLP law firm influenced this investigation in our

25   view improperly and directed it improperly because it was

1  supposed to be an impartial investigation and it wasn't

2  from the outset, Your Honor.

3  The e-mails, I don't think it's -- really I don't

4  believe that it's fair to our client, Your Honor, that

5  these e-mails go in without the testimony behind them, and

6  these e-mails are very compelling.

7  There are several e-mails and Judge Neiman looked at

8  many of them and concluded that something is wrong when

9  the defense firm is directing and influencing the

10  investigation from the outset.

11  Quite frankly, Your Honor, I was deposed in this

12  case, and I'm expected to be called as a witness.

13  Attorney O'Connell is here to try the case with me and

14  part of the reason he's here is because I'm going to

15  testify in the case.

16  I'm a little surprised but Attorney Schrengohst was

17  deposed in this case related to this issue and some of her

18  testimony was very compelling in this case, Your Honor, on

19  what was done and what shouldn't have been done in terms

20  of a proper and appropriate investigation.  So to say that

21  they now can't be called as a witness is just not right in

22  this case.

23  THE COURT:  Well, other courts have reviewed

24  this and I think both the state and federal authority that

25  has reviewed it have looked for, you know -- again I'm not

1    saying you don't have the right to put on this type of

2    evidence but that alternatives to that should be explored.

3         Why wouldn't the introduction of documents and

4    Attorney Rigali, I'm not getting your argument as to why

5    that's not enough?  Why that wouldn't -- I wouldn't

6    deprive you of showing anything that you want to show.

7              MR. SHEA:  Well, it's not just Attorney Rigali's

8    e-mails, Your Honor.  It's not just what he did or didn't

9    do.  It's leaving out the whole aspect that he was

10   supposed to be the independent and impartial investigator.

11             THE COURT:  E-mails that Attorney Rigali

12   reviewed somehow wouldn't be admissible without -- why

13   wouldn't they?

14             MR. SHEA:  They certainly could be admissible,

15   Your Honor, but you don't have the testimony from the

16   people who are sending them and why they sent them.  All

17   you're seeing is a blank e-mail with Attorney Rigali's I

18   guess testimony on the witness stand I received this

19   e-mail.

20        Again the perfect example of what I'm talking about

21   outside the documents is we deposed Attorney Schrengohst

22   and Attorney Schrengohst's testimony is key and important

23   in this case, as is Attorney Royal's testimony in this

24   case, because it shows how they influenced Attorney

25   Rigali.

1    So if Attorney Rigali gets on the stand and he says I
2    did a fair and impartial investigation and you see the
3    e-mails going back and forth, it's not just the e-mails.
4    It's what the defense firm did or didn't do in this case
5    that was inappropriate and it's very compelling, Your
6    Honor.
7        THE COURT:  Well, that's a strong statement.  I
8    mean, you're not saying information they have is relevant
9    on a certain issue.  You're saying that what they did was
10   inappropriate?
11       MR. SHEA:  Well, yes.  I'll give you an example,
12   Your Honor.  I went to a meeting with my client --
13   Attorney Rigali called a meeting with me and my client to
14   investigate the allegations.  It was part of this
15   investigation.
16       Nobody mentioned the fact that the law firm of Royal
17   LLP was behind the scenes and involved in this
18   investigation.  I never would have produced my client at
19   such a meeting frankly.  It's kind of like a defense firm
20   asking to meet with my client and portraying them as an
21   independent investigator.
22       In any event, Attorney Rigali, who had no experience
23   in investigating sexual harassment complaints, then sought
24   the advice of the law firm on how to write his report,
25   sending drafts to the law firm to review, and that is very

1    compelling, Your Honor.

2        I'll give you an example, if I might.  Here's an

3    e-mail from Attorney Schrengohst to Henry Rigali during

4    the investigation.  It says, "First, we need to wrap up

5    the investigation" -- this is from Attorney Schrengohst to

6    Attorney Rigali, Your Honor.  "We need to wrap up the

7    investigation regarding Ms. Koss's allegations as soon as

8    possible, which will involve meeting with each board

9    member.  Please let me know if there's anything I can do

10   to help facilitate this."

11       "As we are very familiar with Attorney Shea's

12   tactics, it is super important that we are able to defeat

13   his argument with evidence that we promptly investigated

14   Ms. Koss's allegations."

15       "Although our preference is to have you investigate

16   because Ms. Koss's allegations include the board

17   generally, we could, as an alternative, have Mike

18   investigate if necessary."  Mike is on the board of the

19   water department.

20       "Also, after the meeting I spoke with Amy and she

21   mentioned sending a response to Attorney Shea's letter.  I

22   did not see anything in the file so I wanted to follow up

23   with you and find out if you had responded to Attorney

24   Shea.  If not, I'm happy to draft something.  The purpose

25   of our response is really to pin them to this story and

1    these allegations as a complete account."

2         That was on April 11th and that was before I was

3    called in to what appeared to be an impartial

4    investigation by Attorney Rigali.

5              THE COURT:  What do you say about the suggestion

6    by Attorney Schrengohst regarding doing a voir dire of the

7    testimony to determine that -- why wouldn't that be --

8    that sounds like actually a pretty good suggestion as to

9    what might be helpful to the Court in making this

10   decision.  I mean, I'm sure you sensing I'm very hesitant.

11   I'm appreciating the role of trial counsel historically --

12             MR. SHEA:  I can understand that, Your Honor.

13             THE COURT:  -- to be put in a situation of

14   telling trial counsel you're going to get called as a

15   witness.  You're going to have to withdraw.  You have a

16   conflict.

17             MR. SHEA:  I understand, Your Honor, but in this

18   case, you know, you've got the *Haddad v Wal-Mart* case

19   which talks about whitewashing investigations.  This is a

20   whitewash investigation, and normally we would not even

21   think of calling counsel as a witness.  I've never seen it

22   before.

23        In this case there is so much compelling evidence and

24   Judge Neiman endorsed that and found that the firm -- that

25   the defense firm was -- in fact, he said at the hearing

1  you've got a real problem to Attorney Schrengohst because

2  these e-mails and documents all came out essentially

3  waiving the attorney-client privilege.  So when that

4  happens and they're so intimately involved and there is so

5  much compelling evidence that this investigation was

6  "influenced" arguably improperly and --

7          THE COURT:  That's the difference.  You're

8  interjecting the word now influence.  Influence puts the

9  different -- if I believe it was influenced, that casts it

10 in a different light than just as Attorney Schrengohst

11 just said if they're providing information, guiding, more

12 of a logistic administrative kind of keep it going, keep

13 it on track, get it done.  I don't want to be involved,

14 just get this done for us.  We can't do anything.

15         MR. SHEA:  No, Your Honor.

16         THE COURT:  That's one thing.  That's very

17 different than influence.

18         MR. SHEA:  I completely understand that, Your

19 Honor.  But as I just read, for the investigator to be

20 sending drafts to the law firm to review and revise and

21 for the law firm to give them the report, the independent

22 report template to draft, among other evidence, Your

23 Honor, is just compelling.

24         THE COURT:  Doesn't that also have to suggest

25 that Attorney Rigali would also have to be acting -- I'm

1   hesitant to say this about attorneys doing their jobs in

2   cases, but even for purposes of just hypothetically

3   speaking now acting inappropriately as well in his

4   independent review?

5           MR. SHEA:  I think using the word

6   inappropriately, Your Honor, or improperly might be a

7   better word because it's not an independent investigation

8   when a defense firm influences, unduly influences that

9   investigation.

10          THE COURT:  Do you assert that the independent

11  investigator assigned in this case was knowingly not

12  independent?

13          MR. SHEA:  He's never done an investigation in a

14  sexual harassment case, Your Honor.  All I can tell you is

15  it looked to me in all the e-mails, many, many e-mails, is

16  that the law firm of the Royal LLP was directing him on

17  what to do.

18      He was seeking -- he was asking what questions to

19  ask.  He was asking how to interview.  He was being told

20  as is evidenced by the e-mail I just read exactly how to

21  skew this so that she is pinned down, that is not an

22  impartial investigation, Your Honor.  That's not a proper

23  investigation.  So to say it's inappropriate or improper I

24  think is an understatement.

25          As far as the voir dire goes --

1           MR. O'CONNELL:  Judge, we just want to make it

2      real clear that we deposed Mr. Rigali.  We don't think he

3      did anything inappropriate.  We just don't think he had

4      any experience in this area, and what we're suggesting is

5      the Royal firm directed him and at times instructed him on

6      how to do it, yet it got to the point where how --

7           THE COURT:  That helped.  I get the distinction.

8           MR. O'CONNELL:  He testified at deposition I've

9      never done anything like this and so I didn't want the

10     Court to think we were suggesting this.

11        When Mr. Shea says inappropriate, we are not

12     suggesting there was anything unethical.  We don't take it

13     that way.  We are simply saying that an employment

14     investigation -- when an employment defense firm who

15     specializes in defense is coordinating the investigation

16     to the hire him and getting him to do it this way, we want

17     you to pin them down on this, that's not a fair and

18     impartial investigation.

19        In the *Haddad v Wal-Mart* case, a sham whitewash

20     investigation is relevant as grounds for punitives, and we

21     would bring the Court's attention to that case because it

22     specifically talks about doing that.

23           THE COURT:  Well, I don't disagree, I don't

24     disagree with if -- I'm underscoring if -- if there was a

25     sham investigation that that wouldn't be relevant at least

1    in my mind, and I have reviewed most of what Judge Neiman

2    did and perhaps I need to take a closer look at what Judge

3    Neiman found.

4        What do you say, Attorney Schrengohst?

5          MS. SCHRENGOHST:  Your Honor, the plaintiff's

6    counsel is stretching the limits of the involvement that

7    Royal LLP had in this situation.

8        If you review some of the documents, you will see

9    that they're very generic questions that were provided to

10    Attorney Rigali, and Attorney Rigali testified that there

11    was suggestions that he took and others that he didn't.

12        There's this suggestion that this is a very uncommon

13    occurrence, but it's very common to consult behind the

14    scenes with HR departments on a regular basis when a

15    complaint is made internally to make sure that the right

16    people are spoken to; that the investigation is done

17    promptly; that all of the information and documents that

18    need to be gathered are compiled.

19        I don't think that there's a way to suggest that one

20    party was being improper or inappropriate without

21    suggesting the other party was as well.  Because if this

22    was a shame whitewash investigation as they're suggesting,

23    then our influence had to have impacted Attorney Rigali in

24    this.

25          THE COURT:  All right.  As far as -- can you

1    explain a little more so we have a clear record why you

2    think a voir dire might be or would be appropriate?  I

3    think it's a good suggestion.

4         When you address this, can you address the portion in

5    your motion, I'm looking at it right now, that during a

6    voir dire there still would be a protective order to

7    preserve any attorney-client privilege that hadn't been

8    waived.  I don't know what attorney-client privilege in

9    the context of a voir dire on that issue wouldn't have

10   been waived.

11        MS. SCHRENGOHST:  The protective order, Your

12   Honor, more generally we're speaking that if you were to

13   disagree with us and we were compelled to testify, that

14   there be a limitation and an understanding in advance of

15   what we're going to discuss so that counsel isn't

16   objecting to testimony on the basis of attorney-client

17   privilege.

18        THE COURT:  So that protective order reference

19   was let's go down that road and you just assumed you are

20   ultimately called as a witness at trial.

21        MS. SCHRENGOHST:  Exactly.

22        THE COURT:  So we can deal with that if and when

23   we need to.

24        MS. SCHRENGOHST:  Yes.  But as far as the voir

25   dire goes, I believe that it will become very clear that

1    our involvement was not to the extent that's being

2    suggested here.

3        As I mentioned, Attorney Royal didn't speak with

4    Attorney Rigali regarding the investigation and didn't

5    speak with any of the defendants related to the

6    investigation.  She was -- her deposition was scheduled

7    but they never proceeded with it.

8        THE COURT:  Ultimately have there been

9    discussions with your client, whoever in the town or city

10   administration that you would identify as being your

11   client, regarding this potential issue regarding possible

12   conflicts?

13       I'm just wondering if this goes to the extent -- I'm

14   interested to hear from both parties on what type of voir

15   dire I need to do with the party or representatives of who

16   you are the attorney for because I need to preserve that

17   wherever this case goes, whatever happens at trial, that

18   that issue is addressed upfront and not left for depending

19   on what the findings are and rulings, verdict, et cetera,

20   an obvious appellate issue.  That conflict issue, has

21   there been any type of discussion?

22       MS. SCHRENGOHST:  We've had some conversation

23   about that we have been identified as witnesses and then

24   planned further discussions after the Court's ruling.

25       THE COURT:  Do you think that is a potential

1   conflict if it turns into an actual conflict waivable?

2           MS. SCHRENGOHST:  I don't think that there's

3   going to be --

4           THE COURT:  All right.  So we don't have to know

5   that now but that's an issue.

6           MS. SCHRENGOHST:  Yes.

7           THE COURT:  Maybe we don't have to cross that

8   bridge but if we do, I would have to know if it's waivable

9   or not.  If it's not, that's one thing.  If it is, that's

10  another and that could affect the timing of this case

11  ultimately.  That's just food for thought I guess right

12  now.

13          MR. O'CONNELL:  Your Honor, if I can just

14  briefly touch on that?  Mr. Shea and I are happy to

15  provide you with records provided -- that Mr. Rigali

16  provided to Judge Neiman, but that was well in advance of

17  a year and a half ago I believe when Judge Neiman ruled on

18  the motion and that pushed back --

19          THE COURT:  That was before Judge Neiman ruled,

20  before or after Mr. Rigali's deposition?

21          MR. O'CONNELL:  No.  Judge Neiman ruled well

22  before Mr. Rigali's deposition, yes.

23          THE COURT:  That's what I thought.

24          MR. O'CONNELL:  Judge Neiman from this -- I

25  believe we were in this courtroom.

1              THE COURT:  Who let him use this courtroom?

2              MR. O'CONNELL:  Well, it's a nice courtroom,

3    Your Honor, but he looked at Ms. Schrengohst and said you

4    have a real problem here and he says your attorney-client

5    privilege may be waived, and with all due respect --

6              THE COURT:  But, really, I would understand that

7    comment regarding that.  When that type of defense is

8    raised and there was an investigation, I think he was just

9    stating what the law is.  Under those circumstances the

10   attorney-client privilege is waived and that in and of

11   itself could be considered a problem.  I think you're

12   asking me to read too far into that.

13             MR. O'CONNELL:  Well, he had these records.

14   They were *in camera* reviewed by him delivered

15   confidentially for his eyes only.  We hadn't even seen

16   them yet and he came out and said you've got a real

17   problem.  Not only it looked like you were involved, you

18   were directing it.

19         Mr. Shea and I assumed they were going to withdraw

20   and get out.  There's a clear conflict.  They don't see

21   it.  I'll tell them in open court, there's a clear

22   conflict, and because they stayed in they now want to voir

23   dire and they want to say we're going to object to this,

24   but these records have been turned over by Henry Rigali

25   pursuant to a subpoena.  He came in and gave us these

1    records.  We are in possession of it.

2        The toothpaste is out of the tube and now they want

3    to sit and say, well, we may not answer all these

4    questions.  We may raise privileges.  I don't think they

5    have the privilege during this time period to waive.

6            THE COURT:  Attorney Schrengohst, do you -- what

7    do you say about Judge Neiman?  It's very hard when you're

8    put in these situations where a litigant is saying the

9    magistrate judge said this or the magistrate judge acted

10   like that and, oh, boy, you should have seen the look on

11   the magistrate judge's face when he said that, that's

12   almost what I feel like where I'm going.

13       I mean, I did look at Judge Neiman's things.  I know

14   he made comments about your involvement.  I think the

15   comments could have been clearly in the context of how you

16   said it, but I also think Judge Neiman's comments about

17   you have a real problem could have been relative to when

18   that defense is raised there is a problem with

19   attorney-client privilege, which is a problem, but that's

20   an entirely different problem than what you're talking

21   about now.

22           MS. SCHRENGOHST:  Your Honor, that was not my

23   interpretation at the time in any way that the judge was

24   saying you have a real problem.

25           THE COURT:  As far as inappropriate influence.

1          MS. SCHRENGOHST:  Exactly.  It was you have a

2     real problem as I've reviewed these documents, you put

3     forward this defense.

4          THE COURT:  You're going to have to turn them

5     over.

6          MS. SCHRENGOHST:  Turn them over, yes.

7          THE COURT:  Those are two very different

8     interpretations of what Judge Neiman could have been

9     intending.

10          MS. SCHRENGOHST:  Yes.

11          MR. O'CONNELL:  The judge stated, "There was an

12     ongoing an active participation in the investigation."

13     Remember, a fair and impartial investigation under the

14     MCAD guidelines.  "There was an ongoing active

15     participation in the investigation on the part of

16     attorneys at Royal LLP in the form of guidance, advice,

17     and direction to Henry Rigali," the individual charged by

18     defendants to investigate.  That's serious because they're

19     not talking general counsel.  You're talking defense

20     counsel outside privately retained.

21          THE COURT:  I understand what you're saying.

22     I'm not sure that rises to the level of influence.  I'm

23     not sure that's a fair way to characterize what Judge

24     Neiman said.

25          I'm not saying I'm pre-deciding your issue.  I'm just

1    saying I think for me, for me to make a conscientiously

2    informed ruling I'm going to need a voir dire.  What would

3    be wrong with doing a voir dire on this?  How would you be

4    harmed by that?

5              MR. O'CONNELL:  I think if it was a voir dire of

6    just a witness, it would be one thing.  But when it's

7    trial counsel who is now seeing the cross and I'm showing

8    all my head to them, this is not a witness who's going to

9    testify and go out and then come back in and testify under

10   oath.  This is trial counsel, and it's almost -- I didn't

11   create this situation.  I hate it.

12       When I was brought into this case by Mr. Shea, nobody

13   likes to point the finger at another attorney.  I don't

14   like it, but I have an ethical obligation to my client.

15   The whole case centered around an unfair directed

16   investigation from an employment defense firm who

17   specializes, it's right on their website, only

18   representing management, aggressive employment defense.

19       How can they be involved behind the scene and Mr.

20   Rigali gives a report and recommendations to the board a

21   month before he ever meets with Mr. Shea's client, the

22   plaintiff.  They're already talking about recommendations.

23       It doesn't -- with all due respect to Ms. Schrengohst

24   and her firm, it doesn't get any more whitewash and sham

25   than that, Judge.  That's our defense to this.

1          Once they whitewashed it, they then pushed her right

2     out the door and the whole time they're investigating my

3     client's claims, it's being done with Royal working with

4     Mr. Rigali.  You haven't seen half of these e-mails yet

5     where they're actually giving him instructions to pinpoint

6     her on her date.  Don't let her wiggle out of this.

7          That's not a fair and impartial investigation, and

8     the board was being CC'd on these e-mails, Judge.  The

9     board that's going to make a decision based on the

10    recommendations, they're on most of the e-mails.  Mr. Shea

11    never got any.  Mr. Shea was never asked for his advice as

12    to recommendations.  Ms. Koss, our client, never knew a

13    defense firm was behind the board that she was pleading

14    with to help her.  No one ever knew.  That's serious.  I

15    don't like it either, but...

16          THE COURT:  All right.  Ms. Schrengohst, one

17    last word on that.

18          MS. SCHRENGOHST:  With being left out, I feel

19    it's important to note in this case in this story about

20    the exchange of a draft prior to Ms. Koss being

21    interviewed is because Ms. Koss refused initially to meet

22    with Henry Rigali and instead submitted a -- and perhaps

23    refused is the wrong word to use, but she decided to

24    submit instead via her attorney a written statement

25    instead of meeting him in person and so a report was

1    created at that time.  When she later met with him, a

2    revised report incorporating that was produced.

3              MR. O'CONNELL:  That's not true.  Mr.

4    Rigali sent her a letter back in February.  "I invite you

5    to provide me with a written description of events in

6    advance."

7              THE COURT:  I'm going to take this matter under

8    advisement on the issue of should I conduct a voir dire,

9    and the primary concern -- one of the primary

10   considerations is would conducting such a voir dire assist

11   me in making an important decision, an extremely important

12   decision regarding the direction the case would go in and

13   a decision that would significantly impact I think the

14   defendants' choice of counsel and so that matter is under

15   advisement.

16        I'll just repeat, Attorney Schrengohst, that at some

17   point really, really perhaps no matter what day I rule on

18   the motion I think we need to look into whether or not

19   your client -- whether or not this issue as a potential

20   conflict is waivable just to protect the record down the

21   road.

22              MS. SCHRENGOHST:  Sure.

23              THE COURT:  All right.  So there we are.  We

24   have our ruling on the one entity issue that you have

25   seven days to try to show me some authority.  Otherwise

1    after we get over that hurdle and that issue of one entity

2    or two entities is resolved, then after we have a

3    foundation of what the ruling is going to be we will

4    discuss -- we'll come back in and discuss some more

5    details on how far you can go with asking questions about

6    what they do separately.

7        So let's first see if the judicial notice ruling is

8    going to stand.  I'm going to take it under advisement and

9    look at again some of what Judge Neiman did.

10       Is there any further materials that I don't have that

11   would be useful in the review in reexamining this issue?

12             MR. O'CONNELL:  Your Honor, a number of

13   materials were turned over to Judge Neiman.  If they're

14   still with the court, then those would be the materials.

15             THE COURT:  So there's no materials other than

16   what was submitted to Judge Neiman?

17             MR. O'CONNELL:  I'm happy to turn them over to

18   the court.

19             THE COURT:  If there's anything that Judge

20   Neiman didn't have or wasn't submitted, anything like

21   that?

22             MR. O'CONNELL:  It's possible.

23             THE COURT:  That may be something you'll want to

24   think about.

25             MR. O'CONNELL:  I'm happy to provide it after

```
 1    showing counsel, I'm happy to provide it, but there are
 2    some records that Attorney Rigali did produce that could
 3    shed light on this.
 4              THE COURT:  That's what you've been reading
 5    from?
 6              MR. O'CONNELL:  Yes, sir.
 7              THE COURT:  What you've been reading from today
 8    is things that Judge Neiman may not have had?
 9              MR. O'CONNELL:  No, he had all the e-males I was
10    referring to, but there's just notes of the investigation,
11    handwritten notes.
12              THE COURT:  Handwritten notes by?
13              MR. O'CONNELL:  By Mr. Rigali.
14              THE COURT:  Well, to the extent that you think
15    that that would be helpful.
16              MR. O'CONNELL:  Could I have until tomorrow
17    morning to submit them?
18              THE COURT:  Sure.  You can submit them.  I'm not
19    going to have a ruling between now and tomorrow morning
20    for sure.  Don't worry about that.  All right.
21         So let me look at what those issues are and we'll
22    schedule -- we'll have you back in court and I will
23    schedule that.  The clerk will notify you when we're back.
24    It's just going to be after that period of whether or not
25    you're able to find an opinion supporting your
```

1    reconsideration because it's likely I'll want to hear you

2    on that as well.  All right.  Okay.

3         So the clerk will be in touch with you regarding the

4    next status after that to see where we are.  I might need

5    some time to look at Judge Neiman's file on the voir dire

6    issue.

7         I can tell you right now, I don't mind sometimes

8    tipping my hand just to be fair to the attorneys and your

9    position, I'm just thinking how could I not do a voir

10   dire?

11              MR. O'CONNELL:  We'll understand whatever

12   decision the Court makes.

13              THE COURT:  So if you're going to submit

14   anything else, you will have at least a day to do that.

15              MR. O'CONNELL:  Okay.

16              THE COURT:  Thank you.

17              MR. ARONSON:  Thank you, Your Honor.

18              MS. SCHRENGOHST:  Thank you.

19              THE CLERK:  All rise.

20   **(Court recessed at 3:08.)**

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4          I, Alice Moran, RMR, RPR, CSR, Official Court

5    Reporter for the United States District Court for the

6    District of Massachusetts, do hereby certify that the

7    foregoing transcript constitutes, to the best of my skill

8    and ability, a true and accurate transcription of my

9    stenotype notes taken in the above-entitled matter.

10

11

12   Date:   June 16, 2015

13

14   /s/ Alice Moran

15   _____
     Alice Moran
16   Offical Court Reporter

17

18

19                    Alice Moran, CSR, RPR, RMR
                        Official Court Reporter
20                   300 State Street, Room 303D
                        Springfield, MA 01105
21                          413-731-0086
                        alice.moran@verizon.net
22

23

24

25